USDC CLERK, CHARLESTON, SC

2007 NOV -9  A 7: 46

## In the District Court of the United States
### For The District of South Carolina
BEAUFORT DIVISION

| | |
|---|---|
| ROCK E. MAYLE, | ) |
| Plaintiff, | ) Civil Action No. 9:06-3048-CMC-GCK |
| vs. | ) |
| MICHAEL J. ASTRUE, | ) **REPORT AND RECOMMENDATION** |
| Commissioner of Social Security[1], | ) **OF THE MAGISTRATE JUDGE** |
| Defendant. | ) |

## I.  INTRODUCTION

This case is before the Court pursuant to Local Civil Rule 83.VII.02(A), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(c).

The plaintiff, Rock E. Mayle (the "Plaintiff" or "Claimant"), brought this action for Disability Insurance Benefits ("DIB") pursuant to Sections 216 and 223 of the Social Security Act, as amended 42 U.S.C. §§ 416(i)--423 (the "Act"), and for Supplemental Security Income ("SSI") under sections 1602 and 1614(a)(3)(A) of Title XVI of the Act, 42 U.S.C, § 1381a, to

---

[1]    On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Commissioner Jo Anne B. Barnhart as the defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

obtain judicial review of a final decision of the Commissioner of Social Security denying his

claims for DIB and SSI benefits under Titles II and XVI of the Social Security Act, respectively.[2]

## II.  BACKGROUND TO CLAIM

### A.  Medical Evidence of Record

Plaintiff was born on June 18, 1956, and alleged disability as of March 14, 2001 due to

reduced cardiac capacity, seizures, major depressive disorder, and diminished intellectual

functioning (Tr. 50, 67-70, 435-36).[3]  Plaintiff has a high school education (Tr. 56, 435) and has

worked in the past as a commercial painter and construction worker (Tr. 51-52, 44).

### 1.  Evidence Prior to March 14, 2001, Plaintiff's Amended Alleged Onset Date.

On February 2, 1998, Plaintiff was hospitalized after he fell off of a ladder at work.

Nasal fracture, atrial fibrillation, possible syncope and seizure disorder by history were

diagnosed.  Plaintiff was treated with medications (Tr. 99-102, 104-07, 111-15).  On February 4,

1998, he underwent open reduction and internal fixation of his nasal fracture (Tr. 103, 108-09).

He was discharged with medications on February 5, 1998 (Tr. 97-98, 124).  In July 1998, he was

---

[2]    The Social Security Act comprises two disability benefits programs.  The Social Security Disability Insurance Program, established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides Disability Insurance Benefits ("DIB") to disabled persons who have contributed to the program while employed.  The Supplemental Security Income Program ("SSI"), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons.  The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (DIB); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical.  See Bowen v. City of New York, 476 U.S. 467, 469-470 (1986).

[3]    Plaintiff alleged an onset date of August 2, 1998 in his applications for DIB and SSI (Tr. 45, 420).  At the hearing on December 17, 2004, he amended his alleged onset date to March 14, 2001 (Tr. 435-36).  Plaintiff previously filed applications for disability insurance benefits and supplemental security income on August 18, 1998.  These applications were denied in initial and reconsidered determinations.  After Plaintiff requested a hearing, an ALJ denied these claims on March 13, 2001.  Plaintiff did not appeal these claims further.  Therefore, the Commissioner's decisions on these prior claims became final and are not before the Court, as the Court has no jurisdiction to review the actions of the Commissioner on these claims.  See Califano v. Sanders, 430 U.S. 99, 107-08 (1977); 20 C.F.R. §§ 404.957(c), 416.1457(c) (incorporating the doctrine of res judicata in the Commissioner's regulations).

treated in the emergency room for an injury to his left eye (Tr. 116-17, 119-23). The following month, he went to the emergency room with reports of seizure activity. He was diagnosed with a seizure disorder (Tr. 134-36).

On March 8, 1999, Plaintiff was hospitalized following complaints of severe chest, right shoulder and neck pain. He reported that he had three drinks of vodka earlier that morning. A chest x-ray showed "slight" haziness on the right, but otherwise clear lungs, and a "borderline" cardiac silhouette. Jennifer Brennan, M.D., noted that Plaintiff's blood alcohol level was 346, and diagnosed alcohol abuse, atrial fibrillation, chest pain and seizures by history (Tr. 129-30, 133). During his hospital course, Plaintiff was treated with medications. Dr. Brennan noted that Plaintiff's seizures were most likely secondary to alcohol. On March 13, 1999, Dr. Brennan prescribed medications and recommended anti-coagulant therapy (Tr. 126-28).

Plaintiff returned to the emergency room on April 18, 1999 with complaints of chest pain. He reported recent alcohol consumption and non-compliance with his medication regimen because he had "no money." A chest x-ray was negative. Alcohol abuse and chronic atrial fibrillation were diagnosed (Tr. 200-04). Plaintiff was treated again for chest pain the following week at the emergency room. An x-ray of Plaintiff's shoulder showed no evidence of acute fracture or dislocation and a focal expansile lesion in his scapula. Atrial fibrillation, alcohol dependence, chest pain of unknown etiology, and a probable benign scapular bone lesion were diagnosed (Tr. 191-97).

Plaintiff went to the emergency room in May 1999 for chest pain and tingling in his left fingers. He reported that he smoked a pack of cigarettes per day and drank a six pack every two to three days. Musculoskeletal chest pain was diagnosed, and medications were prescribed (Tr.

137-48). Six months later, he was treated again in the emergency room after consuming excessive alcohol and experiencing a seizure (Tr. 188-90).

On December 3, 1999, Plaintiff presented to Family Health Centers for seizures, shortness of breath and dizziness. He reported smoking one and one-half packs of cigarettes per day and drinking a twelve-pack of beer per week (Tr. 165-73). He was transported to the emergency room where he reported that he was a "social drinker" (Tr. 154-59). He reported to M.J. Krzyston, M.D., that he stopped taking anti-coagulant and anti-seizure medications two weeks previously because he "ran out of money." Dr. Krzyston diagnosed atypical chest pain, atrial fibrillation and mitral stenosis, and admitted Plaintiff for treatment with anti-coagulant and anti-seizure medications (Tr. 152-53).

Plaintiff presented to Orangeburg Area Mental Health Center on December 20, 1999, for complaints of nervousness and feeling upset after his wife "put him out." He was diagnosed with acute stress disorder. Individual therapy, medications and psychiatric care were recommended (Tr. 224-29). He went to the emergency room again the following day for chest pain. He reported that he still smoked one and one-half pack of cigarettes per day. R.E. Swetnam, D.O., concluded that the majority of Plaintiff's problems appeared to be anxiety related. He diagnosed non-cardiac chest pain and anxiety and prescribed medication (Tr. 149-50).

In January 2000, Plaintiff underwent an electroencephalogram, which was abnormal (Tr. 333-34). An echocardiogram showed that he had moderate to severe mitral valve stenosis, but was otherwise normal (Tr. 328). He sought treatment at the Medical University of South Carolina ("MUSC") Heart Clinic for chest pain and shortness of breath. Medications were

prescribed and an echocardiogram and Coumadin (an anti-coagulant) therapy were recommended (Tr. 329-32). Plaintiff went to Orangeburg Area Mental Health Center for "bad nerves" and difficulties sleeping and concentrating. G. Hooker, M.D., diagnosed acute stress disorder and prescribed Serzone (anti-depressant) (Tr. 223).

Plaintiff continued to undergo Coumadin therapy at the MUSC Heart Clinic in February 2000, where it was noted that he had missed several doses of Coumadin and Phenytoin (an anti-seizure medication) because he could not afford it. He was referred to a social worker to determine if he were eligible for medication assistance programs (Tr. 324-27). In March 2000, Plaintiff returned to Dr. Hooker, reporting that he did not get his Serzone filled (Tr. 222). He was treated again at the emergency room for seizures. A chest x-ray was negative and a head CT scan showed remote left occipital infarct with no acute event identified. Seizure with subtherapeutic Dilantin (an anti-convulsant) levels was diagnosed, and Plaintiff was treated with medications (Tr. 183-87). He also underwent further Coumadin therapy (Tr. 321). At further emergency room treatment for seizures, he reported noncompliance with anti-seizure medications and was instructed to take his medications as prescribed (Tr. 289-91).

Plaintiff continued to receive treatment at Orangeburg Area Mental Health Center for acute stress in April 2000 (Tr. 222). That same month, he presented at MUSC, reporting that he smoked cigarettes and drank a six pack of beer per week. He was diagnosed with mitral valve stenosis, atrial fibrillation, seizure disorder and depression. Medications were prescribed, and an evaluation for mitral valve replacement surgery was recommended. He was instructed to stop smoking and drinking (Tr. 316-19). Plaintiff also underwent further Coumadin therapy (Tr. 313, 315-16).

In May 2000, Plaintiff again received treatment at Orangeburg Area Mental Health Center for anxiety and depression (Tr. 221). He also went to MUSC for a pre-surgical evaluation. A seizure disorder of unknown etiology was diagnosed, medications were prescribed, and Plaintiff was instructed to follow up after one to two months (Tr. 312). A brain MRI study was recommended (Tr. 312), which showed that Plaintiff had mildly advanced cortical atrophy for his age, no acute intracranial lesion, mild widening of the third ventricle and sinusitis (Tr. 309-10). He continued to attend Coumadin therapy, where he reported missing several doses of his anti-seizure medication (Tr. 308).

In June 2000, Plaintiff was treated at the Storm Eye Institute for glaucoma (Tr. 206-09). He continued Coumadin therapy (Tr. 307) and treatment at the Orangeburg Mental Health Center

(Tr. 220). He presented to MUSC for follow-up, where it was noted that he underwent a left heart catheterization, which showed normal coronary arteries and an ejection fraction of 50%. He was diagnosed with seizures, mitral stenosis, atrial fibrillation and increased liver function tests were diagnosed, and Plaintiff's medications were continued (Tr. 304-06).

On July 11, 2000, Plaintiff returned to MUSC feeling "a little shaky." He said that he drank two beers the previous afternoon. Anti-seizure medications were prescribed. He also attended Coumadin therapy, where he reported that he had not taken his Coumadin or Phenytoin for a week because he ran out and could not buy more (Tr. 301-02).

On September 11, 2000, Anil Juneja, M.D., completed a "medical source statement" wherein he stated that Plaintiff had poor abilities (seriously limited, but not precluded) to follow rules, use judgment, deal with stress, function independently, maintain attention, follow/carry out

complex/detailed instructions, behave in an emotionally stable manner, relate in social situations, and demonstrate reliability (Pl.'s Br., Ex. A).

Plaintiff saw J.W. Blanton, M.D., for his anxiety and depression on September 20, 2000; Dr. Blanton adjusted his medications (Tr. 219). On October 3, 2000, Plaintiff missed an appointment at the Coumadin clinic. It was noted that he received Coumadin and Phenytoin through a pharmaceutical company assistance program the previous July and was notified to come and pick them up, but he failed to do so (Tr. 413).

Plaintiff was hospitalized on October 6, 2000, following seizure activity and a laceration to his tongue. He reported that he still smoked cigarettes and drank four to five cans of beer per day. He said that he last drank three weeks previously. He was treated intravenously with Dilantin. A head CT scan showed diffuse atrophy with ischemic changes in his posterior left brain, but no evidence of acute bleed or mass. He was also treated with anti-coagulants. He was discharged on October 11, 2000, with medications (Tr. 210-15, 295-300). Plaintiff continued with Coumadin therapy through the remainder of October 2000 (Tr. 243-44). He also followed up at MUSC, where he was diagnosed with "seizures of unknown etiology (possibly ETOH withdrawal seizures)" and essential tremor. He was prescribed medications (Tr. 241).

On December 17, 2000, Plaintiff went to the emergency room with complaints of seizures and chest pain. His blood alcohol level was 380 and he was diagnosed with atypical chest pain, alcohol intoxication and alcohol-related seizures. He was instructed to stop drinking and to take his anti-seizure medications as prescribed (Tr. 292-94).

**2. Evidence Dated on or after March 14, 2001, Plaintiff's Amended Alleged Onset Date**

On July 19, 2001, a treatment summary from Orangeburg Area Mental Health Center indicated that Plaintiff was discharged from care with a diagnosis of stable acute stress disorder due to "inconsistency in services" (Tr. 218). On July 28, 2001, Plaintiff presented to the emergency room again with complaints of seizures. Psychiatric and physical examinations were normal, except an abnormal heart rate. Seizures, atrial fibrillation and non-compliance were diagnosed, and medications were prescribed (Tr. 285-88).

On August 12, 2001, Plaintiff went to the emergency room again, reporting that he lost consciousness and fell out of a chair. He reported that he drank four beers earlier in the day. It was noted that Plaintiff appeared "mildly intoxicated" and had a laceration on his nose, a contusion on his forehead and cervical spine tenderness. Cervical spine x-rays were unremarkable, and a head CT scan showed that Plaintiff had a broken nose and marked diffuse brain atrophy with ventriculomegaly, most likely representing an old infarct. Alcohol intoxication and facial lacerations were diagnosed, and Plaintiff was told again to stop drinking alcohol (Tr. 279-84).

On September 19, 2001, Plaintiff saw Eni Okonofau, M.D., for chest pain. He reported that he smoked one-half pack of cigarettes per day and denied alcohol use. Dr. Okonofau diagnosed chest pain, stable seizure disorder and atrial fibrillation with "fair rate control." He ordered an echocardiogram and continued Plaintiff's medications (Tr. 237-39).

On October 18, 2001, Plaintiff underwent a myocardial perfusion scan, which was normal (Tr. 278). On November 3, 2001, a chest x-ray showed that Plaintiff had cardiomegaly without acute cardiopulmonary process (Tr. 277).

On November 6, 2001, Plaintiff presented to Charleston Memorial Hospital with complaints of more frequent seizures. He reported that he ran out of his anti-seizure medications several weeks previously and could not afford to refill them. He also reported that he drank "socially." Plaintiff was diagnosed with seizures and atrial fibrillation. Dilantin and Coumadin were prescribed and Plaintiff was advised that he "must not drink" (Tr. 235-36).

Plaintiff presented to the emergency room on March 18, 2002, with complaints of seizures. He reported that he had been out of his medications for several months. A psychiatric examination was normal, except that Plaintiff was postictal and "slightly confused." A physical examination was normal except for some eye nystagmus. Seizures were diagnosed, and Dilantin was prescribed (Tr. 272-76).

On April 3, 2002, Plaintiff returned to the emergency room for seizures and facial injuries. A psychiatric examination was normal, and a physical examination showed that Plaintiff had pain to palpation of his left orbit with crepitance, an abnormal heart rate and left lower extremity pain. Seizure, medical non-compliance and facial contusions were diagnosed. Plaintiff was instructed to take Dilantin and Coumadin as prescribed, speak with a counselor about getting financial help for his prescriptions, and stop smoking and drinking (Tr. 267-71).

He visited the emergency room again on October 15, 2002 for heart problems and seizures. He admitted that he was not taking Dilantin as prescribed because he could not afford it. He said that he smoked cigarettes and drank alcohol "occasionally," including two beers the previous day. Facial and left lower extremity injuries were noted. A head CT scan showed diffuse cortical atrophy and low attenuation of the medial left occipital lobe, possibly representing the sequela of a previous ischemic event (Tr. 246-51).

On February 22, 2003, Plaintiff went to the emergency room after having a seizure. He reported that he had not taken Coumadin or Dilantin in six months. He was described as uncooperative and smelling of alcohol. Acute seizures, atrial fibrillation and alcohol withdrawal were diagnosed. Plaintiff was advised to take his Dilantin, follow up with his primary care physician, and to stop drinking alcohol (Tr. 261-66).

Plaintiff presented to the emergency room again on June 10, 2003, complaining of seizures and shortness of breath. Plaintiff denied alcohol use, but smelled strongly of alcohol, and staggered in the triage area. Seizures were diagnosed and Dilantin was prescribed (Tr. 252-60).

On August 26, 2003, Joseph Gonzalez, M.D., a State agency physician, reviewed the medical evidence and determined that Plaintiff could perform medium work that did not require climbing of ladders, ropes or scaffolds, more than occasional climbing of ramps and stairs, or more than frequent stooping, kneeling, crouching and crawling. He also found that Plaintiff should avoid concentrated exposure to hot/cold and all exposure to hazards (Tr. 342-51).

On September 30, 2003, Vidya Upadhyaya, M.D., examined Plaintiff at the request of the Commissioner. Plaintiff complained of anger management problems, including a history of battering his wife after getting drunk, depression, hearing voices and seizures. He stated that he had been off his medications for six months and last had a seizure two weeks previously. He denied suicidal or homicidal ideation. Plaintiff reported a history of alcohol consumption, but when pressed for quantities of alcohol that he consumed, he stated "I can't remember." He stated that he felt like he needed to cut down on his alcohol use, but denied needing an "eye-opener" in the morning or feeling guilty or annoyed when people asked him about his drinking. He said that he last drank alcohol four days previously when he had three beers. He was "extremely reluctant

to give history of alcohol use" and stated that he did not have a drinking problem. Plaintiff further reported that he spent his days watching television, walking his dog, cleaning up around the house, cooking, doing dishes and washing laundry. Dr. Upadhyaya found that Plaintiff was alert, oriented and cooperative, but extremely guarded. He also found that Plaintiff had poor eye contact, no signs of psychomotor retardation, goal directed thought processes, and no signs of suicidal or homicidal ideation, delusions, or psychosis. He noted that Plaintiff could recall three of three objects after one minute and two of three objects after three minutes. He also noted that Plaintiff was oriented to the month and year, could spell "world" forwards with one mistake in spelling it backwards and could perform serial threes, but not serial sevens. He diagnosed alcohol dependence and major depressive disorder, and assigned a GAF score of 55. He noted that Plaintiff would benefit from extended compliance in taking his medications and opined that he may be able to return to work (Tr. 352-55).

On October 7, 2003, M. Patrick Jarrell, Ph.D., a State agency psychologist, reviewed the medical evidence and found that Plaintiff had depression and a substance addiction disorder, resulting in mild limitations on his activities of daily living and social functioning, moderate limitations on concentration, persistence and pace, and no episodes of decompensation (Tr. 360-73). He also found that Plaintiff had moderate limitations on his abilities to understand and remember detailed instructions and maintain attention and concentration. He concluded that Plaintiff could perform simple, repetitive, tasks for extended periods without special supervision (Tr. 356-58).

On March 16, 2004, Plaintiff presented to Charleston Mental Health Center for problems associated with his depression and alcohol abuse. Plaintiff reported that he had low self-esteem,

decreased appetite and sleep, low motivation, crying spells, feelings of hopelessness, and tendencies for isolation. He also reported that he had not taken any medications for six months and had two seizures during the previous three weeks. Plaintiff minimized his alcohol use and had difficulty remembering the quantities and dates of his alcohol consumption, but admitted to two DUIs, being criticized for his drinking, and feeling guilty about it. Plaintiff was unable to complete serial threes or spell the word "world" backwards, but his reading comprehension was good. He had poor memory, easy distractibility and anxiety. He reported hearing unintelligible voices on occasion. Major depressive disorder and alcohol abuse by history were diagnosed, and therapy and medications were recommended (Tr. 404-07).

On March 29, 2004, William Cain, M.D., a State agency physician, reviewed the medical evidence and found that Plaintiff could perform medium work that did not require climbing of ladders, ropes or scaffolds, more than occasional climbing of ramps and stairs, or more than frequent stooping, kneeling, crouching and crawling. He also stated that Plaintiff should avoid concentrated exposure to temperature extremes and all exposure to hazards (Tr. 378-85).

On March 30, 2004, Herbert Gorod, M.D., a State agency psychiatrist, reviewed the medical evidence and found that Plaintiff's depression and substance addiction disorder resulted in moderate limitations on his activities of daily living, social functioning and concentration, and persistence and pace, with no episodes of decompensation (Tr. 386-99). He also found that Plaintiff had moderate limitations in his abilities to understand, remember and carry out detailed instructions and to complete a normal workday and workweek (Tr. 400-03).

Plaintiff saw Elliot Eley, M.D., a psychiatrist, on April 7, 2004. Dr. Eley diagnosed major depressive disorder, anxiety disorder and alcohol abuse in partial remission, and he prescribed

medications (Tr. 412). On May 19, 2004, Plaintiff saw Dr. Eley again, who noted that Plaintiff was "doing better." Plaintiff denied alcohol use, but "smell[ed] like he had been drinking." Dr. Eley found that Plaintiff had normal speech, good eye contact, blunted affect, "on [and] off" mood and goal directed thought processes. He diagnosed major depressive disorder, anxiety disorder and alcohol abuse in partial remission. He adjusted Plaintiff's medications (Tr. 411).

On June 9, 2004, Plaintiff was treated at the Franklin Fetter Family Health Center for ankle pain and swelling (Tr. 411). On July 6, 2004, he returned to Dr. Eley, who noted continued problems with depression, anger and tremors, and he again adjusted Plaintiff's medications (Tr. 411).

On October 7, 2004, Plaintiff saw Dr. Eley again, reporting that his "anger [was] better controlled," but he continued to have crying spells. Dr. Eley found that his speech was normal, he was cooperative with good eye contact, and he had blunted affect, "so-so" mood, and goal directed thoughts. He prescribed medications and continued therapy (Tr. 410).

### B. Testimony before the ALJ

### 1. Plaintiff's Testimony

The Honorable Richard L. Vogel, an Administrative Law Judge (the "ALJ"), heard Plaintiff's case on December 17, 2004 in Charleston, South Carolina (Tr. 432-449). Plaintiff was represented by counsel. At his hearing, Plaintiff testified that he was a 48 year old high school graduate who was unable to work due to a seizure disorder. Plaintiff's attorney established Plaintiff's onset date as March 14, 2001, based on the prior unfavorable decision having been dated March 13, 2001, and on medical records relevant to this time period (Tr. 434-435). The ALJ accepted this onset date. Plaintiff confirmed that he had not worked since March of 2001.

He stated that he had not consumed alcohol for six to eight months and that he had two to five seizures per month (Tr. 437) and that he was beginning to be able to recognize the signs just prior to having one.. He explained that it was important for him to find a place to sit down immediately upon feeling the signs of seizure activity because in the past it has caused him to fall and split his head open, which required suturing in the emergency room (Tr. 437). Plaintiff was prescribed Dilantin to treat his seizure disorder, but that he could not always afford to get the prescription filled (Tr. 438). He said it was difficult for him to obtain treatment for his condition and that usually he received treatment after having a seizure that required a visit to the emergency room because of injuries sustained during the seizure (Tr. 438). He said that he did not take his medications as prescribed because he could not afford them and nobody provided them to him for free (Tr. 438).

Plaintiff also testified about heart problems in the form of frequent chest pain for which he took nitroglycerine every other day (Tr. 439). He said that he also experienced shortness of breath, dizziness, and fatigue as a result of his heart condition (Tr. 439-440). Plaintiff stated that he had to rest after walking five to ten feet because he had difficulty breathing (Tr. 439-40).

Plaintiff also testified that he suffered from depression and experienced memory problems. He received treatment for depression at a mental health center off of Charlie Hall Boulevard, where he was prescribed Effexor. He explained that he was charged $2.00 per visit, but often had difficulty paying that amount. Plaintiff testified that he continued with treatment there despite his inability to pay (Tr. 441). He stated that the Effexor was not controlling all of his depressive symptoms and that he continued to feel suicidal at times. Plaintiff also suffered from tremors in his hands. His doctors had been unable to ascertain the cause of this tremor.

Plaintiff testified that the tremor made it very difficult for him to eat because food constantly fell off the eating utensils (Tr. 442).

Plaintiff testified that he had been living with his sister temporarily and alternated between living there and staying with friends (Tr. 442). He said that on a typical day he might go outside and try to walk a little bit, read, or watch TV. Plaintiff said he sometimes washed dishes but he dropped them. Plaintiff used to enjoy fishing but could not longer engage in this activity because it was too dangerous in light of his seizure disorder (Tr. 443). He could not remember exactly when his seizures began, but that believed they began in his 20s. Plaintiff said he had been through numerous diagnostic studies at several different medical facilities in an effort to determine the cause of his seizures.

Plaintiff said he quit drinking about six to eight months prior to the hearing because he finally came to the realization that it would kill him if he did not stop. He explained that while he did drink for many years, he did not believe it to be a problem similar to that of a drug addict needing a fix (Tr. 443-444). He said that his doctors had been advising him to quit drinking for some time.

Plaintiff testified that his Dilantin cost about $22 per month. He was often unable to afford the medication (Tr. 447). He stated that the clinic usually did not have samples of Dilantin or Coumadin (which he needed to thin his blood because of his heart condition). He stated that he had never applied for Medicaid because he was not sure how to go about doing this (Tr. 447-448).

### 2. The Vocational Expert's Testimony

Sondra Henry, a vocational expert (the "VE"), testified that Plaintiff's past employment as a painter, which was classified as medium duty work with an SVP of 7 (Tr 444). Plaintiff

confirmed that he had worked as a painter from 1976-1998, over twenty years (Tr. 444). The VE then confirmed with Plaintiff that he did not have a driver's license and had not driven for many years because of his seizure disorder (Tr. 445). The ALJ posed a hypothetical that included an individual of Plaintiff's age, educational and work background, capable of performing light duty work with no climbing and/or exposure to hazards, incapable of driving, but capable of occasional fine manipulation, but requiring a low stress non-sequential production setting (Tr 445). The VE testified that considering an individual of Plaintiff's age, education, past relevant work experience, and residual functional capacity ("RFC") to perform light work, such an individual could perform the unskilled light jobs of bander and bench assembler and that both positions were widely available in the national and local economies (Tr. 445-46). In response to questions posed by Plaintiff's attorney, the VE testified that someone who had seizures while working would be unable to perform the jobs previously cited (Tr 446). The VE confirmed that seizure disorder often affects an employer's initial willingness to hire a person. She stated that a person with short-term memory problems and difficulty concentrating could still perform work as a bander, but probably not as an assembler (Tr. 446-447).

## III.  ADMINISTRATIVE PROCEEDINGS

The Plaintiff filed the current application for SSI and DIB on April 11, 2003, with a protective filing date of March 17, 2003. Plaintiff's applications were denied initially and upon reconsideration by the Agency (Tr. 16). Plaintiff timely filed a Request for Review on July 14, 2005 (Tr. 12), which the Appeals Council denied on September 19, 2006 (Tr. 7-10). As mentioned above, an administrative hearing was held on December 17, 2004, in North Charleston, South Carolina before the ALJ. On May 26, 2005, the ALJ issued a decision denying

benefits to Plaintiff (Tr. 13-30). The Plaintiff filed a Request for Review of Hearing Decision/Order with the Appeals Council on July 14, 2005 (Tr. 12). The Appeals Council denied Plaintiff's appeal on September 19, 2006 (Tr. 7-10), thereby making the ALJ's decision the Commissioner's final decision for the purposes of judicial review. *See* 20 C.F.R. §§ 404.981, 416.1481. The Plaintiff has exhausted his administrative remedies, the parties have briefed the case, and it is now ripe for judicial review under Section 205(g) of the Act, 42 U.S.C. § 405(g).

## IV. THE COMMISSIONER'S FINDINGS

In making his determination that the Plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2002.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's atrial fibrillation with mitral valve stenosis, major depressive disorder, diminished intellectual functioning, and alcohol dependence with a seizure disorder are considered "severe" based in the requirements in the Regulations. (20 CFR 404 §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. When consuming alcohol, the claimant retains the residual functional capacity to perform less than sedentary work due to an inability to maintain pace.

7. When sober, the claimant has the residual functional capacity to perform a significant range of light work. (20 CFR §§ 404.1567 and 416.967).

8. When not consuming alcohol, the claimant retains the residual functional capacity to lift and carry items weighing 10 pounds frequently and 20 pounds occasionally with the following additional limitations: occasionally to engage in activities involving fine

manipulation; never to work around hazards; to perform low-stress, non-sequential production work; and never to drive or to climb.

9.    The claimant is unable to perform any of his past relevant work. (20 CFR §§ 404.1565 and 416.965).

10.   The claimant is a "younger individual between the ages of 45 and 49." (20 CFR §§ 404.1563 and 416.963)

11.   The claimant has a "high school education." (20 CFR §§ 404.1564 and 416.964).

12.   The claimant has no transferrable skills from any past relevant work and/or transferability of skills is not an issue in this case. (20 CFR §§ 404.1568 and 416.968)

13.   Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform while sober. Examples of such jobs include work as a bander (light; DOT#920.687-026; SVP of 1; with 919,900 jobs available in the nation) and a bench assembler (light; DOT #706.684-022; with 549,000 jobs available in the nation).

14.   Although the claimant is "disabled" as defined in the Social Security Act, his alcoholism is a material factor contributing to this disability. Pursuant to revised Sections of 223(d)(2) and 1614(a)(3) of the Social Security Act, the claimant is not eligible for benefits.

## V. APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability." 42 U.S.C. § 423(a). Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509; *Barnhart v. Walton*, 535 U.S. 212 (2002).

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential

questions that are to be asked during the course of a disability determination. 20 C.F.R. §§

404.1520, 1520a; *Heckler v. Campbell*, 461 U.S. 458 (1983); *Walls v. Barnhart*, 296 F.3d 287,

290 (4th Cir. 2002); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981). The five questions are:

> (1) whether the claimant is engaged in substantial gainful activity as defined in Sections 404.1510, 404.1571 et seq., 416.971 *et seq.* If such determination is affirmative, no disability will be found. 20 C.F.R. §§ 404.1520, 416.920.

> (2) whether the claimant's impairments meet the durational requirement (Sections 404.1509 and 416.909) and are severe (Sections 404.1520(c), 416.920(c)). If they do not meet those requirements, no disability will be found. 20 C.F.R. §§ 404.1509, 416.909, 404.1520(c), 416.920(c).

> (3) whether the claimant has an impairment which meets or medically equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1) (the "Listing of Impairments") 20 C.F.R. §§ 404.1520(d), 416.920(d). If one of the listings is met, disability will be found without consideration of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d).

> (4) whether the claimant has an impairment which prevents past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e).

> (5) whether, in light of vocational factors such as age, education, work experience and residual functional capacity ("RFC"), the claimant is capable of other work in the national economy. The claimant is entitled to disability only if the answer is "no." 20 C.F.R.§§ 404.1520(f), 416.920(f).

An individual may be determined not disabled at any step if found to be: gainfully

employed, not severely impaired, not impaired under the Listing of Impairments (20 C.F.R. Pt.

404, Subpart P, App. 1), or capable of returning to former work. In such case, further inquiry is

unnecessary. If, however, the claimant makes a showing at Step Four that return to past relevant

work is not possible, the burden shifts to the Commissioner to come forward at Step Five and

"prove that the claimant, despite [his] impairments, can perform a 'significant number of jobs in

the national economy.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (*per curiam*),

*quoting Walls v. Barnhart*, 296 F.3d at 290. The Commissioner may meet this burden by relying

on the Medical-Vocational Guidelines (the "Grids") or by calling a vocational expert to testify.

20 C.F.R. § 404.1566. The Commissioner must prove both the claimant's capacity and the job's

existence. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). If an individual is found not

disabled at any step, further inquiry is unnecessary. *See Hall v. Harris*, 658 F.2d 260, 264 (4th

Cir. 1981). Only if the final step is reached does the fact finder consider the claimant's age,

education, and work experience in light of his or her residual functional capacity. *See Hall*, 658

F.2d at 264. Residual functional capacity is a determination, based on all of the relevant medical

and non-medical evidence, of what a claimant can still do despite her impairments; the

determination of the residual functional capacity is the responsibility of the ALJ. *See* 20 C.F.R.

§§ 404.1520, 404.1545-46; SSR 96-8p.

     With respect to the general procedure for determining SSI disability benefits, the standard

consists of a two-fold test: The claimant must show a medically determinable physical or mental

impairment, and the impairment must be such as to render the claimant unable to engage in

substantial gainful employment. *Walker v. Harris*, 642 F.2d 712 (4th Cir. 1981), *citing Blalock v.

Richardson*, 438 F.2d 773 (4th Cir. 1972); 42 U.S.C. § 423(d); 20 C.F.R. § 404.1501(b).

## VI.  SCOPE OF REVIEW

     Under the Social Security Act, 42 U.S.C. § 405(g) and § 1383(6)(3), this court's scope of

review of the Commissioner's final decision is limited to: (1) whether the decision of the

Commissioner is supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390,

401 (1971); and (2) whether the Commissioner applied the correct legal standards. *Hays v.

Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

The Court's scope of review is specific and narrow.  It does not conduct a *de novo* review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees with it, so long as it is supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Smith v. Chater*, 99 F.3d 635, 637 (4th Cir. 1996); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Barnhart*, 434 F.3d at 653, *citing Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted).  At a minimum, "substantial evidence" to support the Commissioner's decision must include:  (1) objective medical facts; (2) the diagnoses and expert opinions of treating and examining physicians on subsidiary questions of fact; (3) subjective evidence of pain testified to by the claimant and corroborated by family and neighbors; and (4) the claimant's educational background, work history and present age. *Blalock*, 483 F.2d at 776.  In reviewing for substantial evidence, the court will not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the ALJ. *Johnson v. Barnhart*, 434 F.3d at 653, *citing Craig*, 76 F.3d at 589 (internal quotation marks omitted).  If substantial evidence supports the Commissioner's decision that a claimant is not disabled, the decision must be affirmed. *Blalock*, 483 F.2d at 775.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Johnson v. Barnhart*, 434 F.3d at 653, *citing Craig*, 76 F.3d at 589 (internal quotation marks omitted); *see also Hays*, 907 F.2d at 1456 (It is the duty of the ALJ reviewing the case, and not the duty of the Court, to make findings of fact and resolve conflicts in the evidence) *and Smith v. Chater*, 99 F.3d at 638

(the duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court) (citation omitted). Therefore, if substantial evidence supports the Commissioner's decision that a claimant is not disabled, the decision must be affirmed. *Blalock*, 483 F.2d at 775.

## VII. THE ALJ'S ANALYSIS

Consistent with the five step "sequential evaluation" for the adjudication of disability claims, the ALJ first found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. (Tr. 25, Finding 2) At Step Two, the ALJ found that Plaintiff established that his atrial fibrillation with mitral valve stenosis, major depressive disorder, diminished intellectual functioning, and alcohol dependence with a seizure disorder were considered to be "severe" impairments. (Tr. 25, Finding 3) At Step Three, the ALJ found that these medically determinable impairments did not meet or medically equal any of the criteria listed in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. (Tr. 25, Finding 4) Prior to determining at Step Four whether Plaintiff could perform her past relevant work, the ALJ assessed Plaintiff's RFC by evaluating the medical evidence and Plaintiff's subjective complaints and found that Plaintiff's allegations regarding his limitations were not totally credible. (Tr. 25, Finding 5) The ALJ further found that Plaintiff, when not consuming alcohol, retained the residual functional capacity to perform light work as defined in the regulations with limitations: occasionally to engage in activities involving fine manipulation; never to work around hazards; to perform low-stress, non-sequential production work; and never to drive or to climb. (Tr. 25, Findings 7 and 8) Thus, at Step Four of the evaluation process, the ALJ found Plaintiff's RFC would preclude him from returning to his past relevant work. (Tr. 26, Finding 9)

The ALJ took testimony from the VE to determine whether Plaintiff, considering his age, education, work experience, skills, and physical limitations, had the capacity to perform any alternative jobs, and that these types of job existed in significant numbers in the national economy. *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981). In this case, VE testified that if she used the State Agency's assessment, there were a significant number of jobs in the national economy that she could perform. Examples of such jobs include light unskilled jobs of banker and bench assembler. The ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act, as amended. (Tr. 26, Finding 14)

## VIII. PLAINTIFF'S OBJECTIONS

The Plaintiff raises one (1) objection in his brief:

1.     **The ALJ erred by combining his alcoholism analysis with his disability analysis, which violates 20 C.F.R. §§ 404.1535.**

A. The ALJ did not first perform the five-step sequential evaluation separate and apart from Plaintiff's alcoholism and then determine the impact of it upon a finding of "disabled." The ALJ found that Plaintiff suffers from the following "severe" impairments: 1) atrial fibrillation; 2) mitral valve stenosis; 3) major depressive disorder; 4) diminished intellectual functioning; 5) alcohol dependence; and 6) seizure disorder. (TR 21). According to 20 C.F.R. 404.1535, a finding of "disabled" was required before the ALJ embarked upon an analysis as to the impact of Plaintiff's alcoholism. Instead, the written decision indicates that the ALJ included Plaintiff's alcoholism at step two of the sequential evaluation process.[4]

B. The ALJ failed to evaluate his impairments under Listing 12.02 (Organic Mental Disorders).

C. The ALJ improperly found that Plaintiff's subjective complaints regarding the severity of his symptoms were not credible.

## IX. DISCUSSION

---

[4]     *See* Plaintiff's Brief at p. 10.

Under 42 U.S.C. § 405(g), the scope of review limits questions before the Court to (1) whether the Commissioner's decision is supported by substantial evidence, and, (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The scope of review authorized by Congress in § 405(g) is specific and narrow. The language of § 405(g) precludes a de novo review of the evidence and requires that the Court uphold the Commissioner's decision, even if the Court disagrees, as long as it is supported by substantial evidence. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Ultimately, it is the duty of the ALJ reviewing the case, and not the responsibility of the courts, to make findings of fact and resolve conflicts in the evidence. See *Hays*, 907 F.2d at 1456.

The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). "Substantial evidence" has also been defined as ". . . evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to satisfy a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

1.    **Whether the ALJ first performed the five-step sequential evaluation separate and apart from Plaintiff's alcoholism.**

In 1996, Congress amended the Social Security Act to preclude an award of disability benefits if alcohol or drug abuse is "a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C); *accord* 20 C.F.R. §§ 404.1535(a) and 416.935(a). Under the implementing regulations, the ALJ makes this determination by first evaluating whether the claimant is disabled under the Social Security Act. If the ALJ finds that the claimant is not disabled, then the claimant is not entitled to benefits and there is no need to proceed with the analysis to determine whether the drug or alcohol addiction is a contributing factor material to the determination of disability. If the claimant is disabled under the Act and there is medical evidence of drug or alcohol addiction, then the ALJ must determine whether Plaintiff would still be disabled if he stopped using alcohol or drugs. If the remaining limitations would still be disabling, then the claimant's drug addiction or alcoholism is not a contributing factor material to his disability. If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied.

In the present case, the ALJ undertook the proper analysis. At Step Two of the sequential evaluation process, the ALJ found that Plaintiff's alcohol dependence was a severe impairment (Tr. 21, 25). The ALJ proceeded to Step Four of the sequential evaluation process, where he found that, considering Plaintiff's alcohol dependence, he retained the residual functional capacity to perform "less than sedentary activities due to an inability to maintain pace" (Tr. 22, 25). With this residual functional capacity, the ALJ found that he was unable to perform either his past relevant work or other work in the national economy (Tr. 23, 25-26). Of course, at Step Four of the five-step sequential analysis, the burden remains on the Plaintiff to establish that he is

incapable of performing her past relevant work. *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); *Hunter v. Sullivan*, 993 F.3d 31, 35 (4th Cir. 1992); *see also Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (only if Plaintiff demonstrates the inability to perform past relevant work does the burden shift to the Commissioner to establish that other jobs exist in significant numbers in the national economy). Therefore, a claimant has the initial burden of showing that he is unable to return to her past relevant work because of her impairments. *See* 20 C.F.R. §§ 404.1512, 404.1520. It is only after Step Four, when the claimant establishes a *prima facie* case of disability, that the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

Without considering the effects of Plaintiff's alcohol addiction, the ALJ found that Plaintiff could lift and carry items weighing ten pounds frequently and 20 pounds occasionally with the following additional limitations: no more than occasional activities involving fine manipulation; no work around hazards; only low-stress, non-sequential production work; and no driving or climbing (Tr. 23, 25). Then, relying on testimony from the VE, the ALJ found that Plaintiff's residual functional capacity (without consideration of limitations due to his alcohol addiction) permitted him to perform a significant number of jobs in the national economy, including the jobs of bander and bench assembler. Therefore, the ALJ found that Plaintiff's alcohol addiction was a contributing factor material to the determination of disability (Tr. 23, 25-26). As stated above, pursuant to the current statutory and regulatory framework, alcoholism and

drug addiction may disqualify a claimant from benefits to the extent such is "a contributing factor material to the Commissioner's determination that the [claimant] is disabled." 42 U.S.C. § 423(d)(2)(C); accord 20 C.F.R. §§ 404.1535(a) and 416.935(a). In the present case, the ALJ found that Plaintiff's alcoholism was a "contributing factor" and that the claimant would not be found disabled if he "stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1) and 416.935(b)(1). The Court finds no error in the ALJ's evaluation of the materiality of Plaintiff's alcohol addiction.

**B. The ALJ failed to evaluate his impairments under Listing 12.02 (Organic Mental Disorders).**

At Step Three of the sequential evaluation, the ALJ found that Plaintiff did not have an impairment that met or medically equaled the requirements of a Listing (Tr. 21, 25). Specifically, the ALJ noted that Plaintiff did not have an impairment that met or equaled the requirements of any Listing in sections 1.00, 11.00, or 12.00 of 20 C.F.R. pt. 404, subpt. P, app. 1 (Tr. 21, 25). This finding is supported by substantial evidence and will be upheld by the Court.

Plaintiff argues that the ALJ should have evaluated his impairments pursuant to Listing § 12.02 since there was evidence "suggestive of an organic mental disorder."[5] However, the ALJ did consider whether Plaintiff had an impairment listed in section 12.00 of 20 C.F.R. pt. 404, subpt. P, app. 1 (Tr. 21, 25). The evidence did not support a finding that Plaintiff's impairments met Listing § 12.02. That Listing § 12.02 requires the presence of organic mental disorders. "The required level of severity for these disorders is met when the requirements of both

---

[5]    *See* Plaintiff's Brief at p. 11.

[paragraphs] A and B are satisfied, or when the requirements in [paragraph] C are satisfied."20

The requirements of paragraph B of Listing § 12.02 are met if the claimant's impairments result

in two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties

in maintaining social functioning; (3) marked difficulties in maintaining concentration,

persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  *See*

§ 12.02.  Paragraph C of Listing § 12.02 requires

> Medically documented history of a chronic organic mental disorder of at least 2 years'
> duration that has caused more than a minimal limitation of ability to do basic work
> activities, with symptoms or signs currently attenuated by medication or psycho-social
> support, and one of the following:
>
> > 1. Repeated episodes of decompensation, each of extended duration; or
> >
> > 2. A residual disease process that has resulted in such marginal adjustment that
> > even a minimal increase in mental demands or change in the environment would
> > be predicted to cause the individual to decompensate; or
> >
> > 3. Current history of 1 or more years' inability to function outside a highly
> > supportive living arrangement[.]  *Id.*

In the present case, there is no evidence to indicate that Plaintiff was ever diagnosed with

an organic mental disorder.  The evidence does not support s finding that Plaintiff satisfied the

requirements of paragraph B.  Plaintiff did not demonstrate "marked restrictions of activities of

daily living," but instead testified that he walked around a bit, "tried to read something," watched

television, cleaned some dishes (Tr. 442) walked the dog, cleaned up around the house, cooked,

and washed laundry (Tr. 352-55).  The evidence did not indicate that Plaintiff had "marked

difficulties in maintaining social functioning;" as shown by Dr. Upadhyaya's September 2003

consultative examination, Plaintiff was alert, oriented and cooperative (Tr. 352-55), and Dr. Eley

found in October 2004 that he had normal speech, was cooperative and had good eye contact (Tr.

410). In September 2003, Dr. Upadhyaya also noted that Plaintiff could recall three of three objects after one minute and two of three objects after three minutes, was oriented, could spell "world" forwards, could spell "world" backwards with only one mistake, and could perform serial threes (Tr. 352-55). These findings were not consistent with "marked difficulties in maintaining concentration, persistence, or pace," nor were findings in March 2004 that Plaintiff had good reading comprehension (Tr. 404-07) and findings by Dr. Eley in May and October 2004 that his thoughts were goal directed (Tr. 410-11). There also was no evidence in the record that Plaintiff experienced any episodes of decompensation of extended duration.

With regards to paragraph C, as previously stated, there was no evidence that Plaintiff experienced repeated episodes of decompensation and there was no evidence that he had a residual disease process resulting in such marginal adjustment that the slightest increase in mental demands or environmental change would cause him to decompensate or that he was unable to function outside of a highly supportive living arrangement. Because Plaintiff's impairments did not satisfy the requirements of paragraphs B and C of Listing § 12.02, they did not meet the Listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (In order for an impairment to meet the requirements of a Listing, it must satisfy "*all* of the specified medical criteria," because "an impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (emphasis in original).

Lastly, the findings of the State agency physicians who reviewed Plaintiff's claim supported the conclusion that he did not have an impairment that met or equaled the requirements of Listing § 12.02, or any other Listing (Tr. 32-33, 342-51, 356-58, 378-85, 422, 428). Pursuant

to Social Security Ruling 96-6p, the findings made by state agency physicians "regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review." *SSR* 96-6 at p.1. "The ALJ is entitled to rely on the opinions of reviewing physicians when considering whether the claimant meets the requirements of a listed impairment." 20 C.F.R. § 404.1527(f); § 416.927(f).

**C. The ALJ improperly found that Plaintiff's subjective complaints regarding the severity of his symptoms were not credible.**

As required, the ALJ considered the credibility of Plaintiff's subjective complaints in determining the functional effects of his symptoms. *See Craig v Chater,* 76 F.3d 585, 591 (4th Cir. 1996); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir. 1984) (citation omitted). As the ALJ's credibility evaluation was supported by substantial evidence and consistent with controlling law, the Court will uphold that finding.

The ALJ considered Plaintiff's subjective complaints in his decision (Tr. 20-21) and, in accordance with Fourth Circuit case law and the regulations, properly found that his subjective complaints were inconsistent with the objective medical evidence (Tr. 22). He had "stable" seizure disorder and atrial fibrillation with "fair rate control" (Tr. 237-39); his physical examination was normal, except for some eye nystagmus (Tr. 272-76); his chest x-ray showed cardiomegaly, but no acute cardiopulmonary process (Tr. 277); his myocardial perfusion scan was

normal (Tr. 278).  Likewise, the medical evidence, including the findings of Drs. Upadhyaya and

Eley and other personnel at the Charleston Mental Health Center, did not support his subjective

complaints regarding the severity of his mental impairments.  He was alert, oriented and

cooperative, but extremely guarded and had poor eye contact, but goal directed thoughts, no signs

of psychomotor retardation, and no suicidal or homicidal ideations, delusions or psychosis.  He

could recall three of three objects after one minute and two of three objects after three minutes,

was oriented to the month and year, could spell "world" forwards, could spell "world" backwards

with one mistake, and could perform serial threes (Tr. 352-55); he could not complete serial

threes or spell "world" backwards, but his reading comprehension was good (Tr. 404-07); his

anger was "better controlled," and he was cooperative and had normal speech, good eye contact,

and goal directed thoughts (Tr. 410); he was "doing better" and had normal speech, good eye

contact, blunted affect and goal directed thoughts (Tr. 411).  *See Johnson v. Barnhart*, 434 F.3d

650, 658 (4th Cir. 2005) (ALJ can reject a claimant's testimony when it is inconsistent with the

objective medical evidence); 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

     As the ALJ noted, the evidence showed that Plaintiff was not compliant with treatment

(Tr. 22).  The record was replete with evidence that Plaintiff did not take his medications as

prescribed.  Prior to March 14, 2001, Plaintiff reported on several occasions that he stopped

taking his anti-coagulant and anti-seizure medications (Tr. 191-97, 152-53, 222, 289-91, 301-02,

308, 413).  In November 2001 and October 2002, he admitted he was not taking his anti-seizure

medications as prescribed (Tr. 235-36, 246-51).  In February 2003, he reported to emergency

room personnel that he had not taken Coumadin or Dilantin in six months (Tr. 261-66), and in

September 2003, also told Dr. Upadhyaya that he had been off medications for six months (Tr. 352-55). In March 2004, he presented to Charleston Mental Health Center, reporting that he had not taken any medications for six months (Tr. 404-07). He was repeatedly instructed to stop smoking cigarettes and drinking alcohol, but failed to do so (Tr. 149-50, 165-73, 210-15, 237-39, 246-60, 267-71, 279-84, 292-302, 313, 315-19, 411). The failure to follow prescribed treatment can be considered as a factor in evaluating a claimant's credibility. *See English v. Shalala*, 10 F.3d 1080, 1084 (4th Cir. 1993).

Plaintiff's daily activities also undermined his claim that his symptoms were so severe as to be disabling. Plaintiff watched television, walked the dog, cleaned up around the house, cooked, did dishes and washed laundry (Tr. 352-55, 442). While not alone determinative, the ALJ considered evidence of Plaintiff's daily activities with the evidence of record as a whole, which supported his conclusion that Plaintiff's limitations were not as severe as he alleged (Tr. 23). *See Johnson*, 434 F.3d at 658 (accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she attended church, read, watched television, cleaned house, washed clothes, visited relatives, fed pets, cooked, managed finances, and performed stretching exercises; *see also Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (affirming finding of no disability where claimant managed his household, grocery shopped, cooked, washed dishes, and walked to town each day).

Other inconsistencies also diminished Plaintiff's credibility. Although Plaintiff denied alcohol use in September 2001, just one month previously he drank four beers and presented to the emergency room "mildly intoxicated" (Tr. 279-84). In June 2003, he denied alcohol use, but

it was noted that he smelled strongly of alcohol and staggered in the emergency triage area (Tr. 252-60). When Dr. Upadhyaya pressed Plaintiff for the frequency and quantity of his alcohol use in September 2003, he said that he could not remember. Dr. Upadhyaya noted that he was "extremely reluctant to give [his] history of alcohol use" and denied having a drinking problem (Tr. 352-55). At a visit to Charleston Mental Health Center in March 2004, Plaintiff had difficulties remembering the quantities and dates of his alcohol consumption (Tr. 404-07). In April 2004, Dr. Eley noted that he denied alcohol use, but "smell[ed] like he had been drinking" (Tr. 411). The ALJ properly considered these inconsistencies in evaluating Plaintiff's credibility (Tr. 22). *See, e.g., Mickles*, 29 F.3d at 921 (inconsistencies supported a finding that Plaintiff's testimony was not credible).

Plaintiff argues that the ALJ improperly considered his noncompliance with treatment in evaluating his credibility because the evidence showed that he was unable to afford treatment (Pl.'s Br. 11). Although Plaintiff claimed to lack the resources to purchase his prescription medications, the record before the ALJ showed that he was provided with free or low-cost Coumadin and Phenytoin in July 2000, but never picked it up (Tr. 413). The record also showed that Plaintiff consistently had the resources to obtain cigarettes and alcohol (Tr. 129-30, 133, 149-50, 165-73, 210-15, 235-39, 246-60, 279-84, 295-302, 316-19, 411). Furthermore, as Plaintiff concedes, the ALJ's evaluation of his credibility was not based entirely on his noncompliance with treatment.[6] Rather, as discussed above, the ALJ also considered the objective medical evidence, evidence of daily activities and other inconsistencies in evaluating Plaintiff's credibility

---

[6]    *See* Plaintiff's Brief at p. 11.

(Tr. 22-23). In reviewing for substantial evidence, the court does not weight conflicting evidence, make credibility determinations, or substitute its judgment for that of the agency. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

After the ALJ properly determined that, with Plaintiff's alcohol addiction, he was limited to less than sedentary work and found that his subjective complaints were not credible, the ALJ evaluated Plaintiff's residual functional capacity without considering the effects of his alcohol addiction. In determining that Plaintiff could lift 10 pounds frequently and 20 pounds occasionally, occasionally perform fine manipulations, never work around hazards, perform low-stress, non-sequential production work and never drive or climb (Tr. 23), he noted emergency room findings from July 2001 (Tr. 18), indicating that Plaintiff had normal psychiatric and physical examinations except for an abnormal heart rate (Tr. 285-88). He also noted a November 2001 chest x-ray (Tr. 19) which showed cardiomegaly, but no acute cardiopulmonary process (Tr. 277), and a March 2002 emergency room report (Tr. 19), which indicated a normal physical examination, except for some eye nystagmus (Tr. 272-26). *See, e.g., Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (findings and opinions of examining physicians constitute persuasive evidence in support of the ALJ's decision). The ALJ also considered the findings of Dr. Gonzalez (Tr. 20), the State agency physician who in August 2003, reviewed all of the evidence available at that date and found that Plaintiff could perform medium work that did not require climbing of ladders, ropes or scaffolds, more than occasional climbing of ramps and stairs, more than frequent stooping, kneeling, crouching and crawling, concentrated exposure to temperature extremes and any exposure to hazards (Tr. 342-51). Dr. Gonzalez' findings generally supported

the ALJ's finding that Plaintiff could perform a reduced range of light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) ("If someone can do medium work, we determine that he or she can also do sedentary and light work.").

The ALJ also considered the findings of Dr. Upadhyaya (Tr. 19-20) who found that, after not drinking alcohol for four days, Plaintiff was alert and oriented, but extremely guarded, with poor eye contact, no signs of psychomotor retardation, goal directed thoughts, and no suicidal or homicidal ideation, delusions or psychosis (Tr. 352-55). Dr. Upadhyaya also found that Plaintiff had good memory and concentration, although he spelled the word "world" backwards with one error and could not perform serial sevens (Tr. 352-55). *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (the opinion of a examining physician provided substantial evidence in support of the ALJ's decision). The ALJ also noted that treatment notes from Charleston Mental Health Center (Tr. 20) in March 2004 indicated that although Plaintiff could not spell the word "world" backwards or complete serial threes, he had good reading comprehension (Tr. 404-07). He also noted the findings of Dr. Eley (Tr. 20), who indicated in May 2004 that Plaintiff was "doing better" and had normal speech, good eye contact and goal directed thoughts (Tr. 411) and that Dr. Eley stated in October 2004 that Plaintiff's anger was "better controlled" (Tr. 410).

The Court recognizes that Dr. Juneja did state in September 2000 that Plaintiff had "poor" abilities to follow rules, use judgment, deal with stress, function independently, maintain attention, follow/carry out complex/detailed instructions, behave in an emotionally stable manner, relate in social situations, and demonstrate reliability.[7] However, Dr. Juneja's opinion was not

---

[7]     *See* Plaintiff's Brief, Exhibit A.

entitled to controlling weight, as it was dated September 11, 2000, over six months prior to

Plaintiff's alleged onset date. Furthermore, there is no evidence that Dr. Juneja ever examined

Plaintiff. His report did not indicate a diagnosis, nor did it indicate whether the limitations he

found were a result of Plaintiff's alcohol addiction. While Dr. Juneja stated that Plaintiff had

"poor" abilities in the areas stated above, his statement defined "poor" as "seriously limited but

not precluded." Moreover, Dr. Juneja's findings were also inconsistent with other evidence in the

record, including the reports of Drs. Upadhyaya and Eley, and the Charleston Mental Health

Center discussed above (Tr. 352-55, 404-07, 410-11). Ultimately, it is the duty of the ALJ

reviewing the case, and not of the court, to make findings of fact and resolve conflicts in the

evidence. *See Hays*, 907 F.2d at 1456.

The ALJ properly determined Plaintiff's residual functional capacity without limitations

due to his alcohol addiction. Next, the ALJ asked the VE to assume a hypothetical individual of

Plaintiff's age and with his education and past work experience with

> [A]n exertional capacity for light work with no climbing and no exposure to hazards. No
> driving of any kind of motor vehicle. No more than occasional fine manipulation, and
> finally a job in a low[-]stress[,] non-sequential production setting.

(Tr. 445.) With these limitations, the VE testified that such an individual could perform the

unskilled light jobs of bander (14,960 jobs in South Carolina and 919,900 nationally) and bench

assembler (1,280 jobs in South Carolina, 449,000 nationally) (Tr. 445-46). Based on this

testimony, the ALJ found that Plaintiff could perform a significant number of jobs in the national

economy (Tr. 24, 26). *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (a vocational

expert's testimony in response to a hypothetical question may be relied upon if the hypothetical

Page 36 of 37

question accurately describes all of the claimant's limitations).  Because Plaintiff could perform a

significant number of jobs in the national economy, he was not disabled.

In conclusion, the Commissioner's finding that Plaintiff was not disabled is supported by

substantial evidence, and will be upheld by this Court.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f)

(2006).

## RECOMMENDATION

Based upon the foregoing, **it is recommended that the Commissioner's decision be**

**affirmed.**

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

November 8, 2007
Charleston, South Carolina